# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| TRACY L. SKINNER,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>STEPHEN T. MOYER,<br>*Secretary of the Maryland Department of*<br>*Public Safety and Correctional Services,*<br>WARDEN FRANK B. BISHOP,<br>*Warden of N.B.C.I.,* and<br>BRUCE LILLER,<br>*Head of Psychology Department and SNU*<br>*Treatment Team,*<br><br>　　　Defendants. | Civil Action No. TDC-17-3262 |

## MEMORANDUM OPINION

Plaintiff Tracy L. Skinner, an inmate at North Branch Correctional Institution in Cumberland, Maryland ("NBCI"), has filed a self-represented Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants Stephen T. Moyer, Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"); NBCI Warden Frank B. Bishop; and Bruce Liller, the head of the Psychology Department and Special Needs Units ("SNU") at NBCI violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165 (2018). Pending before the Court is Defendants' renewed Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, which is now fully briefed. Also pending are Skinner's Motion to File a Supplemental Complaint and Motion for Leave to Enter Automatic Disclosures. For reasons set forth below, Skinner's Motion to File a Supplemental Complaint will be GRANTED, Skinner's

Motion for Leave to Enter Automatic Disclosures will be DENIED, and Defendants' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Skinner is serving a 30-year sentence imposed in 2003 for second-degree murder. *State v. Skinner*, No. 20-K-03-7732 (Cir. Ct. Talbot Cty. Nov. 11, 2003). He suffers from schizo-affective disorder and post-traumatic stress disorder, and in May 2012 he was transferred for treatment to Patuxent Institution ("Patuxent") in Jessup, Maryland. On June 1, 2013, Skinner assaulted a correctional officer at Patuxent Institution and was charged with first-degree assault. On July 8, 2013, Skinner was transferred to NBCI. On October 15, 2014, he was admitted to the SNU at NBCI.

On December 10, 2014, Skinner was found not criminally responsible on the assault charge. *State v. Skinner*, No. 13-K-14-54433 (Cir. Ct. Howard Cty. Dec. 10, 2014). However, the Circuit Court for Howard County ("Circuit Court") determined that Skinner did not require confinement to a psychiatric hospital and instead would remain at NBCI or another prison operated by the DPSCS Division of Correction ("DOC") to complete his criminal sentence and would be transferred to a psychiatric hospital after the completion of that sentence. Skinner was required to receive mental health treatment while in prison. *State v. Skinner*, No. 13-K-14-54433 (Cir. Ct. Howard Cty. May 28, 2015).

### I.    The Special Needs Unit Program

At NBCI, Skinner was placed in the SNU. The SNU Program provides a continuum of care for inmates with serious mental illness in the least restrictive environment consistent with institutional safety and security. Inmates in the SNU have individualized treatment plans to promote recovery from mental illness. For each inmate, the SNU Treatment Team ("SNU Team")

2

determines the inmate's level of freedom and privileges based on the inmate's actions and progress. These privileges and freedoms are assessed and adjusted at monthly treatment plan review meetings. In general, there are three assessment levels that provide different levels of privileges and social interaction. An SNU Level 1 assessment is given when an inmate's mental health functioning is dangerous or severely disruptive. For such inmates, meals are served in-cell and recreation is provided alone. An SNU Level 2 assessment is given when the inmate's functioning is impaired, but he can function well enough to interact socially with other inmates without posing a danger to others. An SNU Level 3 assessment is given when the inmate has mild functional impairment due to mental illness, meaning that the inmate is able to function with minimal staff support in all areas of daily living. Inmates on SNU Level 3 eat meals in the dining room and are capable of holding a prison job.

If an SNU inmate commits an infraction, the SNU Team assesses whether the severity of the infraction warrants a change in level and placement in segregation. If the infraction is the result of psychological issues, or if the inmate becomes psychotic, the inmate may be placed in administrative segregation until the inmate's stability is restored. If an SNU inmate commits a serious "category I" infraction, such as an act of violence or a serious threat of violence, the inmate may be placed in administrative segregation pending a hearing. Liller Decl. ¶ 6, Mot. Summ. J. Ex. 2, ECF No. 31-3.

Skinner signed SNU informed consent forms every year acknowledging his agreement to participate in the SNU program because of his mental health. In these forms, he was advised that he was expected to attend the monthly treatment plan review meetings at which his mental health history and diagnosis are discussed. From 2015 through 2018, Skinner had approximately 44

monthly reviews as part of the SNU Program and had approximately 120 sessions with various mental health providers at NBCI, including psychiatrists, therapists, and social workers.

## II.    Administrative Segregation

According to Skinner, on July 23, 2015, he was placed in administrative segregation for complaining to the SNU Team about harassment from unidentified correctional officers. The SNU Monthly Review report for this time period, dated July 22, 2015, records "no negative behavior" by Skinner. Monthly Review, ECF No. 33 at 53. However, on July 23, 2015, Skinner received a Notice of Assignment to Administrative Segregation for "psychological reasons" as determined by a mental health provider. Notice of Assignment to Administrative Segregation, ECF No. 18-2 at 1. Skinner subsequently received such a notice on four other occasions: December 16, 2015, January 27, 2016, January 25, 2017, and April 27, 2018. In each notice, Skinner was informed that he would be "seen by the case management team within five days" of placement on administrative segregation and given the opportunity to be heard as to whether he should be continued in this status. *Id.* On August 5, 2015, Warden Bishop approved Skinner's return to SNU Level 2. Skinner was moved to SNU Level 3 on August 19, 2015.

According to Skinner, his placement on administrative segregation on December 16, 2015 was because he had complained at his SNU monthly review meeting that "the midnight shift would not open his door at breakfast time." Compl. ¶ 18, ECF No. 1. However, in an administrative remedy procedure grievance ("ARP") submitted on December 16, 2015, Skinner stated, "I Tracy Skinner #317270 was placed on Admin. Seg. on 12-16-15 at 2:00 p.m. at my own request," and that he was not given his medication that day. ARP No. NBCI 2621-15, ECF No. 33 at 114. Skinner claims generally that he "was tormented and antagonized by security staff as well as

psychology staff" before he was removed from administrative segregation on December 30, 2015 and assigned to SNU Level 3. Compl. ¶¶ 19-20. Warden Bishop approved that transfer.

On January 14, 2016, Skinner attempted to commit suicide by cutting his wrist with a razor. According to Skinner, he did so because he became "emotionally distraught" because of "the ongoing harassment and torment by the Defendants." *Id.* ¶ 21. Skinner was treated by a doctor for three lacerations and placed on suicide watch at Western Correctional Institution. On January 27, 2016, Skinner was removed from suicide watch and assigned to administrative segregation based on "medical or psychological reasons, as determined by a health care provider, that require your removal from general population" and to "review [a] court order for treatment compliance." Notice of Assignment to Admin. Segregation, ECF No.18-2 at 5.

On February 26, 2016, the psychology department submitted a request for Skinner to be removed from administrative segregation and assigned to SNU Level 1. On March 2, 2016, Warden Bishop approved the request. According to Skinner, while he was on SNU Level 1, he was subjected to 23-hour-per-day lockdown and deprived of access to telephones and therapy.

On April 27, 2016, after the SNU Monthly Review, Skinner was moved to SNU Level 2. On June 22, 2016, however, the SNU Monthly Review Team moved Skinner back to SNU Level 1 because he was "decompensating," was observed using his "fists and chairs" to beat windows, threatened to "kill someone," and told correctional officers that "the gloves are off." Monthly Review (6/22/16), ECF No. 33 at 41. According to Skinner, on June 23, 2016 he was "locked down," without having been served with an infraction, as a form of punishment. Compl. ¶ 25. On July 20, 2016, at the SNU Monthly Review, an SNU Team that included Liller approved keeping Skinner in administrative segregation for another month. Liller was not part of the SNU Team

that decided at the August 17, 2016 Monthly Review to keep Skinner at SNU Level 1, but he was part of the SNU Team that approved moving Skinner back to SNU Level 2 on September 22, 2016.

On October 19, 2016, Skinner was moved to SNU Level 3 and displayed no negative behavior until January 2017. Liller approved his SNU Level 3 status in November and December 2016. On January 23, 2017, Skinner was observed hitting his cell wall with his hands and destroying a chair. On January 25, 2017, after Skinner was also verbally abusive to others, Liller directed that Skinner be placed on administrative segregation. On January 27, 2017, Skinner was treated for self-inflicted wounds to his face. During the medical visit, Skinner yelled "just kill me" and "Barbara get me out of here." Medical Report at 3, Opp'n First Mot. Summ. J. Ex 4, ECF No. 18-4. Skinner was taken to the emergency room at the Western Maryland Regional Health System, where he was examined and discharged the same day. Liller was part of the SNU Team approving Skinner's segregation in February 2017 and then moving him to SNU Level 3 on April 5, 2017. He remained on SNU Level 3, with Liller's approval, until September 2017.

On September 27, 2017, Skinner seriously injured another inmate, Tyrese Keene-Taylor, during a fight. Skinner did not respond to direct orders by a correctional officer to stop fighting and continued to strike the other inmate, threw him to the floor, and kicked him in the head before pepper spray was used by the officer to restrain Skinner. Skinner was charged with violating Rule 102, prohibiting assault or battery on another inmate. At an adjustment hearing on October 20, 2017, he was found guilty and sanctioned with 180 days of disciplinary segregation. No diminution credits were revoked. According to Skinner's Rule Violation Summary Index, this was the first time Skinner was charged with an inmate rule violation at NBCI. Notably, Skinner expressly excludes the September 27, 2017 rule infraction from his claim of due process violations.

On March 28, 2018, Skinner attended his SNU Monthly Review meeting. According to Skinner, he was due to be removed from disciplinary segregation early and moved to SNU Level 2, but because he complained that he was receiving improper mental health treatment and was subjected to harsh and abusive treatment, he was removed from the meeting and placed back on segregation. Skinner also asserts that he told the SNU Team that he would not drop the present civil action, which he filed in November 2017, even if he was returned to the SNU. He alleges that in retaliation for this incident, Defendants placed him on administrative segregation "permanently." Supp. Opp'n Mot. Summ. J. ¶¶ 9-10, ECF No. 36. According to SNU Monthly Review reports, as of February 28, 2018, Skinner was slated to be eligible to leave disciplinary segregation as of May 8, 2018. That month, the SNU Team learned that Skinner was not taking his medication because he felt that he was on too many medications. On April 27, 2018, Skinner received a notice that he was assigned to administrative segregation because he had a documented enemy in the general population, presumably Keene-Taylor, the inmate with whom he fought in September 2017.

Skinner asserts that he has been in administrative segregation ever since and is thus confined to a cell for 23 hours a day, with one hour of counseling each month. He is allowed three showers each week, and his only recreation time outside is in a "one man cage" on night shift, in contrast to the "normal life of SNU program inmates," which includes television and telephone access, outside recreation with basketball courts, library visits, and group therapy sessions. *Id.* ¶¶ 12-13, 15. He asserts that as a result of these conditions, he suffers sensory deprivation, anxiety, hyper response to stimuli, self-destructive outbursts, and insomnia.

Defendants, he alleges, have "no intention of removing him from administrative segregation which makes every monthly administrative segregation review unmeaningful." *Id.* ¶

11. He claims that Defendants are placing him in administrative segregation and in SNU Levels 1 and 2 so they do not have to "deal with" him. *Id.* ¶ 15.

On December 18, 2018, in response to an inquiry about his status, Skinner's social worker, Ms. Rozas, told Skinner that the SNU Team continues to review his case "in absentia" each month and that if Skinner did not have an enemy on the SNU tier, he could return there. Inmate Request Form, Opp'n Second Mot. Summ. J. Ex. 12 at 1, ECF No. 36-3.

As of March 11, 2019, Skinner remained assigned to administrative segregation. On July 12, 2019, after Skinner wrote to Rozas complaining that his administrative segregation review hearings are "sham hearings" because the SNU Team will not return him to the SNU while Keene-Taylor remains there, Rozas responded by stating that she would try to help him but that "[t]here is a lot of resistance to you coming off ad/seg from admin and custody." Inmate Request at 10, Supp. Compl. Ex. 2, ECF No. 38-2.

## III.   ARPs

Skinner alleges that he submitted several ARPs while on administrative segregation but that "NBCI administration refused to process them." Compl. ¶ 16. From the time he arrived at NBCI until the filing of the present case in November 2017, Skinner filed eight ARPs. Three of the ARPs were complaints about Skinner's social worker, Ms. Wilson. In ARP NBCI-1575-15, dated July 29, 2015, he complained that Wilson violated his First Amendment rights by calling him to her office and convincing him not to file an ARP that he had already submitted "by persuasion, manipulation, coercion, making me a false promise, and telling me a blatant lie." ARP No. NBCI-1575-15, ECF No. 33 at 91. The ARP was procedurally dismissed by the institutional ARP coordinator for failure to submit information needed for investigation. In ARP NBCI-1577-15, also dated July 29, 2015, Skinner asserted that Officer Adams, the tier officer to whom he had

given his ARP for filing, violated his First Amendment rights by not submitting it for signature to Sgt. Forney but instead giving it to Wilson and then taking Skinner to the meeting with Wilson. As part of the investigation of that ARP, Wilson provided a signed statement that she had met with Skinner to address his ARP in an attempt to resolve his concerns "at the lowest level possible." *Id.* at 97. Wilson stated that after their meeting, Skinner "indicated that I could tear up the ARP" but that she "declined and gave the form back to him." *Id.* The ARP was dismissed by the Acting Warden for lack of merit because prison directives provide that "staff and inmates are encouraged to make a good faith effort to resolve all institutionally related inmate complaints at the lowest staff level as possible," such that Officer Adams followed proper procedure. *Id.* at 93.

In ARP No. NBCI-15-1576, Skinner complained that for three weeks Wilson had been trying "to pressure and coerce" him into taking his antipsychotic medicine and had caused him to be placed on administrative segregation as part of that effort. ARP No. NBCI-15-1576, ECF No. 33 at 98-99. Liller was assigned to investigate ARP NBCI-15-1576, but the record before the Court does not reflect what response Skinner received. Skinner's other ARPs related to his commissary account, medication for back problems, and a broken cell vent. The responses were signed by the ARP Coordinator or the Warden's designee. Skinner also withdrew one of the ARPs.

## DISCUSSION

### I. Skinner's Motion to File a Supplemental Complaint

On August 7, 2019, after the briefing on Defendants' Motion was completed, Skinner filed a Motion to File a Supplemental Complaint, ECF No. 38, pursuant to Federal Rule of Civil Procedure 15(d). "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). To the extent that the

Motion could be construed as seeking to amend the Complaint, leave to amend a complaint should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend should be denied "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986).

The proposed Supplemental Complaint includes a verified complaint document that provides more recent facts and attaches additional exhibits. In general, Skinner asserts that his administrative segregation has continued indefinitely since his original Complaint was submitted in November 2017, that he is not receiving the treatment associated with the SNU Program, that his mental health is deteriorating under these circumstances, and that he is not receiving any meaningful review of his placement status. His primary legal theory is that the prolonged administrative segregation violates his right to due process of law, but construed liberally, he also asserts a claim that the conditions violate his Eighth Amendment right to be free from cruel and unusual punishment based on the harsh conditions and his lack of access to mental health treatment. Skinner also names new Defendants on the grounds that he learned their specific identities through the exhibits submitted with Defendants' briefs on their Motion: William Bohrer, Chief of Security; Lieutenant Whiteman; Michelle Sawyers, Program historian designee; Jane/John Does, Case Managers/SNU Team; Richard Roderick, Case Management Manager; Jason McMahan, Case Manager of the Administrative Segregation Review Board; Susan M. Johnson, Administrative Segregation Review Board; Mr. Tischnell, Administrative Segregation Review Board; and Jane/John Does, Administrative Segregation Review Board.

Where these allegations largely arise from events since the filing of the original Complaint and advance the same or similar legal theories, the Court will grant the Motion and accept the

Supplemental Complaint. *See* Fed. R. Civ. P. 15(d). However, where the Supplemental Complaint was filed after the briefing on Defendants' Motion for Summary Judgment, and re-filing of the Motion in light of the Supplemental Complaint would cause unnecessary delay in this case, the Court will treat it in the following manner for purposes of that Motion. To the extent that the verified Supplemental Complaint provides additional evidence relevant to the Motion, the Court will consider that evidence in resolving Defendants' Motion. To the extent that the legal theories are the same as those asserted in the original Complaint, or can be assessed without additional input from Defendants, the Court will address those theories. However, where the Court's rulings rely on facts or arguments in the Supplemental Complaint, any ruling adverse to Defendants will be without prejudice.

As for the newly identified Defendants, the Court will not address here whether the Supplemental Complaint states plausible claims for relief against each new Defendant, except that at this time, pursuant to 28 U.S.C. § 1915A, the Court will dismiss the John/Jane Doe Defendants referenced in the Supplemental Complaint. As a general matter, use of John Doe defendants is not favored in the federal courts. *See Schiff v. Kennedy*, 691 F.2d 196, 198 (4th Cir. 1982). Where other similarly situated Defendants have been named, Skinner's claims may proceed without Jane/John Doe Defendants. If Skinner learns the names of additional Defendants during the pendency of this case, he may then seek leave to amend the Complaint. Upon resolution of the pending motions, the Office of the Attorney General of Maryland will be directed to identify those new Defendants for whom it will accept service.

## II. Motion to Enter Automatic Disclosures

Skinner has also filed a Motion for Leave to Enter Automatic Disclosures, ECF No. 40, to which he attached documents relating to his security classification reviews and infraction history.

To the extent that Skinner seeks leave to submit these documents for consideration in resolving Defendants' Motion for Summary Judgment, the Court will consider them. However, to the extent that Skinner requests that the Court order the parties to submit initial disclosures under Federal Rule of Civil Procedure 26(a), the motion will be denied as premature. Under this Court's standard practices, discovery does not commence until after the issuance of a Scheduling Order, which ordinarily occurs once Rule 12 motions are resolved. Thus, any Rule 26 disclosures need not be produced at this time.

### III.    Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

Construed liberally, Skinner alleges in his Complaint that from July 23, 2015 onward, Defendants have violated his constitutional rights by placing him in administrative segregation (1) under conditions and with inadequate mental treatment that constitute cruel and unusual punishment, in violation of the Eighth Amendment; (2) without due process of law, with the exception of his September 27, 2017 adjustment hearing, in violation of the Fourteenth Amendment; and (3) in retaliation for filing grievances, including complaining about harassment by correctional officers and lack of access to breakfast, in violation of the First Amendment. As to the SNU Program, Skinner also asserts that (1) his placement in the various levels of the SNU Program serves to punish him, in violation of his right to equal protection of the law under the Fourteenth Amendment; and (2) by denying him access to the SNU Program, Defendants have violated the ADA. Finally, Skinner claims that Defendants' refusal to process his ARPs violated his First Amendment right to access the courts and Fourteenth Amendment right to due process, and that his requests to use the telephone for legal matters was denied in violation of his First Amendment right to access the courts.

In their Motion, Defendants assert that (1) claims against them in their official capacities are barred by the Eleventh Amendment; and (2) the Complaint fails to state a claim because it does not allege their personal participation in the alleged violations. They also argue that the record evidence does not support a finding of violations of Skinner's constitutional rights or of the ADA, and that they are entitled to qualified immunity. Because Defendants provide no argument or analysis on qualified immunity other than to state the general legal standard, that argument has not been properly asserted and will not be considered.

A.    **Legal Standards**

Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one

for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirement has been satisfied by the title of Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 245 (4th Cir. 2002). Skinner has not filed an affidavit seeking discovery and has submitted exhibits with his memorandum in opposition to the Motion ("Opposition"). Under these circumstances, on those arguments for which the Court must consider submitted exhibits, the Court will construe the Motion as a Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome

of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## B.    Eleventh Amendment

Skinner asserts claims against Defendants in their individual and official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. amend. XI. In effect, the Eleventh Amendment bars suits for damages against a state in federal court unless the state has waived sovereign immunity or Congress has abrogated its immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). "[A] suit against a state official in his or her official capacity is . . . a suit against the official's office" and thus is the equivalent of "a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

Although Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-201(a) (LexisNexis 2014), it has not waived its immunity under the Eleventh Amendment to constitutional claims asserted in federal court. Accordingly, Defendants are immune from suit for actions taken in their official capacity. The constitutional claims for damages asserted against Defendants in their official capacities will be dismissed.

## C.    Supervisory Liability

Where Skinner's claims are asserted under 42 U.S.C. § 1983, "[i]n order for an individual to be liable under § 1983, it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). There is no vicarious liability, or *respondeat superior* liability, under § 1983. *Iqbal*, 556 U.S. at 676; *Wright*, 766 F.2d at 850.    Nevertheless, because "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care," supervisors may be held liable under § 1983 for the violations of their subordinates under certain circumstances. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citation omitted).    Specifically, a claim of supervisory liability must be supported by evidence that:   (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Here, the Complaint contains no allegations that either Secretary Moyer or Warden Bishop personally participated in the events underlying Skinner's claims or was even aware of them. Thus, the Complaint fails to state a plausible claim against them.    Although in his Opposition Skinner asserts that "[w]hen Defendants Moyer and Bishop agreed to house Plaintiff on NBCI's SNU tier for psychiatric care, both defendants became obligated to accommodate Plaintiff so Plaintiff can meet each and every condition of the order of the state court," there is no evidence in

the record to support the conclusion that Secretary Moyer had any role in Skinner's housing placement. Opp'n Mot. Summ. J. at 5, ECF No. 18. Other than receiving a copy of the Circuit Court order finding Skinner not criminally responsible for assault but returning him to DOC custody to complete his sentence, the only evidence that Warden Bishop was aware of or involved in Skinner's housing placement are the notices he signed approving Skinner's release from administrative segregation back to the SNU on August 5, 2015, December 31, 2015, and March 2, 2016. Where there is no evidence that Warden Bishop was aware of or involved in Skinner's SNU Monthly Review meetings or the decisions to place Skinner in administrative segregation, and where the signatures on Skinner's ARPs reveal that they were received and reviewed by other personnel, the Court finds that the record is insufficient to support a finding of supervisory liability on the part of Warden Bishop. The Motion will be granted as to Secretary Moyer and Warden Bishop.

As for Liller, although the Complaint does not explicitly identify his specific actions, the SNU Monthly Review reports reflect that Liller participated in many of those meetings and signed off on certain decisions to send him to administrative segregation. Although Liller's signatures on these documents alone do not necessarily establish liability, his direct involvement in decisions relating to Skinner's mental health treatment and housing placements precludes dismissal based on lack of personal participation. The Motion will be denied as to Liller on this ground.

### D. Administrative Segregation

#### 1. Eighth Amendment

Skinner asserts that Defendants have been "tormenting and antagonizing" him by placing him in "lockdown" in violation of his rights under the Eighth Amendment. Compl. ¶ 30.

According to Skinner, his placement in administrative segregation or SNU Level 1 causes him "mental and emotional anguish." *Id.*

The Eighth Amendment's guarantee against cruel and unusual punishment prohibits "unnecessary and wanton infliction of pain" upon a prisoner. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

The Eighth Amendment protects inmates from inhumane treatment and conditions. *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). To establish an Eighth Amendment claim based on conditions of confinement, a prisoner must show that: (1) objectively, "the deprivation suffered or injury inflicted on the inmate was sufficiently serious," and (2) subjectively, "the prison official acted with a sufficiently culpable state of mind." *Iko*, 535 F.3d at 238 (citation omitted). The objective prong requires that the prisoner sustains a "serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of serious harm resulting from . . . exposure to the challenged conditions." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *De'Lonta*, 330 F.3d at 634).

When assessing whether conditions of solitary or segregated confinement violate the Eighth Amendment, courts must consider "what the Supreme Court has termed the evolving standards of decency that mark the progress of a maturing society." *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854, 860 (4th Cir. 1975) (en banc) (citation omitted). Recently, the United States Court of Appeals for the Fourth Circuit has stated that "prolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019) (quoting *Incumaa v. Stirling*, 791 F.3d 517,

534 (4th Cir. 2015)). Courts must consider "the totality of the circumstances," including "the time covered by the punishment or deprivation." *Mitchell v. Rice*, 952 F.2d 187, 191 (4th Cir. 1992); *see also Rivera v. Mathena*, No. 18-6615, 2019 WL 6133727, at *4 (4th Cir. Nov. 19, 2019) (considering "the duration of harm" as an important factor in the Eighth Amendment analysis).

Here, Skinner asserts that when he has been in administrative segregation or SNU Level 1, he has been confined on 23-hour-a-day lockdown, with one hour each night for solitary recreation in a cage such that he is deprived of sunlight, three showers per week, and no access to work programs, social work programs, peer groups, or mental health counseling. From July 2015 to September 2017, his stints in administrative segregation were limited. He served 14 days from July 23, 2015 to August 5, 2015; 14 days from December 16, 2015 to December 30, 2015; 35 days from January 27, 2016 to March 2, 2016, followed by 56 days in SNU Level 1 until April 27, 2016; 55 days from June 23, 2016 to August 17, 2016, followed by 36 days in SNU Level 1 until September 22, 2016; and 70 days from January 25, 2017 to April 5, 2017. However, since September 27, 2017 until the present, Skinner has been in disciplinary or administrative segregation continuously, first as a result of a 180-day sanction for fighting with an inmate, and then, after March 28, 2018, apparently because he cannot be returned to the SNU because the inmate with whom he fought is in that unit. Skinner states that as a result of these conditions, his mental health has regressed to the point that he has started to harm himself. He asserts that he suffers anxiety; hyper response to external stimuli; perceptual distortions; worsening olfactory, visual, and auditory perception; motor excitement often connected to self-destructive outbursts; and insomnia.

Conditions for inmates on segregation such as 23-hour lockdown, one hour of recreation a day, three showers a week, and restrictions from participating in prison programs do not

necessarily constitute unconstitutional conditions if imposed for a limited period of time. *See In re Long Term Administrative Segregation of Inmates Designated as Five Percenters ("Five Percenters")*, 174 F.3d 464, 471-72 (4th Cir. 1999). Thus, the two-week periods of segregation in 2015 did not violate the Eighth Amendment. Where the record is not clear on whether and how the conditions differed between administrative segregation and SNU Level 1, it is possible that Skinner lived under such conditions for two to three months on three occasions in 2016 and 2017. Nevertheless, for that duration, and where Skinner has not set forth facts showing that he suffered injury from those specific periods of segregation, the Court finds that the evidence does not support an Eighth Amendment violation arising from those time periods.

However, Skinner's present allegation in the Supplemental Complaint is that he has been in segregation under these conditions since September 2017, well over two years now, and is being held there indefinitely. Under these circumstances, the conditions faced by Skinner are similar to those deemed unconstitutional in *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019). In *Porter*, Virginia death row inmates were confined indefinitely for 23 or 24 hours a day; were allowed one hour of outdoor recreation, five days a week, in a cage; were limited to three ten-minute showers per week; and were not permitted to participated in religious or prison programming. *Id.* at 353-54. Where there was evidence that these and other conditions were causing "a significant risk of substantial psychological and emotional harm," the court held that the conditions violated the Eighth Amendment. *Id.* at 354, 357. Likewise, in *Five Percenters*, inmates who had committed violent acts had been placed in segregation indefinitely under which they remained in their cells for 23 hours per day, had only five hours of recreation per week, and were not permitted to participate in prison programs. 174 F.3d at 471. Although the court did not find that the conditions violated the Eighth Amendment, it relied in part on the fact that the only harm alleged by the

plaintiffs was depression and anxiety. *Id.* at 472. By contrast, where Skinner has alleged a more significant impact on his mental health, and where he is documented to have significant mental health issues and is supposed to receive treatment such as that provided by the SNU Program but is not currently receiving such programming, the Court cannot find that the conditions of confinement are constitutional as a matter of law. *See Porter*, 923 F.3d at 357.

Furthermore, Skinner has alleged sufficient facts to show that prison officials have been subjectively aware of the risk to his mental health conditions. He has submitted numerous Inmate Requests and ARPs, submitted to the prison, describing the impact of the long-term segregation on his mental health. Particularly where Skinner was designated to the SNU Program in response to the Circuit Court's determination that he was not criminally responsible for an assault but has been out of that program for almost two years, there is a genuine issue of material fact on whether prison officials knew of and have disregarded an excessive risk to Skinner's health or safety. *Scinto*, 841 F.3d at 225. Where Liller has participated in Skinner's repeated and continued placement on administrative segregation, and the Supplemental Complaint names other individuals involved in those decisions, Skinner has identified proper defendants on this claim. The Court will therefore deny Defendants' Motion on Skinner's claim of unconstitutional conditions of confinement.

Construed liberally, Skinner's allegations, particularly upon consideration of the Supplemental Complaint, can be construed as also asserting an Eighth Amendment violation based inadequate mental health treatment since he has been in administrative segregation. A prisoner's Eighth Amendment rights are violated by inadequate medical care amounting to deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There is "no underlying distinction between the right to medical care for physical ills and its psychological and

21

psychiatric counterpart." *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("Courts treat an inmate's mental health claims just as seriously as any physical health claims.").

Skinner is presently alleging that during his prolonged, indefinite assignment to administrative segregation, he is not part of the SNU Program and he is not receiving adequate mental health treatment for his undisputedly serious mental health conditions. He has specifically alleged that he is not permitted to participate in mental health counseling while in administrative segregation, with the exception of one hour of "talk therapy" each month. Supp. Opp'n Mot. Summ. J. ¶ 5, ECF No. 36. Other than records showing 16 contacts with mental health treatment provides between September 2017 and March 2018, the record is not well-developed on what type mental health treatment Skinner has received in segregation since September 2017, and how frequently it has been provided since March 2018. Where these allegations are more clearly stated in the Supplemental Complaint, Defendants have not had a fair opportunity to present such evidence. Under these circumstances, the Court will deny the Motion without prejudice as to this claim.

### 2. Due Process

Skinner also alleges that the decisions to place him in administrative segregation violate his right to due process of law. Ordinarily, prisoners do not have a right to due process in their housing assignments. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976). "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Id.* Although prisoners are entitled to due process when sanctions are being imposed that could affect the overall duration of

the prisoner's sentence, a prisoner does not have a right to due process before placement in a more restrictive housing placement unless the conditions "present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin v. Conner*, 515 U.S. 472, 478-79, 486 (1995). Such a liberty interest exists if the conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

Ordinarily, assignment to administrative segregation does not create an atypical and significant hardship. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life). In *Sandin*, an inmate who was sentenced to 30 days of disciplinary segregation, served that time, and then had the disciplinary decision overturned on appeal, filed a due process claim under § 1983. 515 U.S. at 476. The Court held that the disciplinary segregation, which did not affect the duration of the prison sentence, did not present the type of "atypical, significant deprivation" that implicates a constitutional liberty interest giving rise to due process rights even though the prisoner was alone in his cell for 23 hours a day, in chains, and was isolated from other inmates. *Id.* at 486. In *Wilkinson v. Austin*, 545 U.S. 209 (2005), however, the United States Supreme Court found that conditions in a super-maximum security prison, where inmates were confined to their cells for 23 hours per day, exercise was limited to one hour a day in a small indoor room, a light remained on in cells at all times, and contact with others was extremely limited, implicated a liberty interest based on the duration of the confinement to the prison, which was reviewed only once per year, and the fact that placement there disqualifies an inmate for parole consideration. *Id.* at 214, 223-24.

Here, the Court finds that, under *Sandin*, there is no due process liberty interest in Skinner's assignment to administrative segregation during the limited periods of time from 2015 to

September 2017. However, given the duration of time he has spent in segregation since September 2017—now well over two years—Skinner's allegation that there is no meaningful review of his placement there, and his submission of a document stating that there is "resistance" to his return to SNU, Inmate Request at 10, the Court cannot conclude that there is no due process interest implicated by this lengthy placement in administrative segregation. Because the claim relating to this more recent time period was primarily addressed in Skinner's Supplemental Complaint, the Court lacks a sufficient record on the nature and frequency of reviews of Skinner's placement to assess whether such an interest exists and, if so, whether Skinner has received due process in relation to his placement. Accordingly, the Court will deny without prejudice the Motion as to Skinner's placement in segregation since September 2017.

### 3. First Amendment

Skinner also alleges that at various times he was placed in administrative segregation in retaliation for filing complaints and grievances. Skinner alleges that on several occasions, he was sent to administrative segregation in retaliation for voicing complaints about certain prison conditions and his mental health treatment, including for filing the present case in November 2017. "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Under this principle, an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 545 (4th Cir. 2017). A constitutional claim of retaliation has three elements: (1) the plaintiff engaged in protected conduct; (2) "the defendants took some action that adversely affected [the plaintiff's] First Amendment rights"; and (3) a causal connection exists between the first two elements, such that the protected conduct motivated at least in part the adverse action.

*See Constantine v. George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *see also Am. Civil Liberties Union of Md., Inc. v. Wicomico Cty.*, 999 F.2d 780, 785 (4th Cir. 1993) (holding that a First Amendment retaliation can apply where the retaliatory action "may tend to chill individuals' exercise of constitutional rights").

Skinner alleges that on July 23, 2015, Defendants placed him on administrative segregation after he complained to the SNU Team about harassment from several officers. Other than the general statement that this move was for "psychological" reasons, the record does not provide an alternative explanation for the move. However, there is no evidence in the record that Liller made the decision to move Skinner to administrative segregation. Rather, he signed the later report noting that he was being returned SNU Level 3.

Skinner also alleges that his placement on administrative segregation on December 16, 2015 was in retaliation for his complaint at his SNU Monthly Review meeting that "the midnight shift would not open his door at breakfast time." Compl. ¶ 18. Even assuming that this complaint about breakfast constitutes protected activity sufficient to form the basis of a First Amendment retaliation claim, Skinner himself contradicted this statement when he stated in an ARP submitted on December 16, 2015 that he was placed on administrative segregation "at my own request." ARP No. NBCI 2621-15, ECF No. 33 at 114. Moreover, there is no evidence that Liller participated in the December 16, 2015 administrative segregation placement. Accordingly, the Motion will be granted as to this retaliation claim.

Next, Skinner alleges that Defendants retaliated against him for filing grievances by accusing him of rule infractions and "locking" him "down," presumably placing him in administrative segregation without due process, but expressly excludes from this claim the September 27, 2017 adjustment hearing. Compl. ¶ 12. Significantly, Skinner's Inmate Rule Index

shows that he has been charged with just one infraction: the September 27, 2017 assault on another inmate that expressly is not part of this claim. The only other reference in the Complaint to an alleged rule infraction is Skinner's assertion that he was locked down from around June 23, 2016 to September 22, 2016 after an accusation of a rule infraction for which he was never charged. However, the SNU Monthly Review report reflects that at the June 22, 2016 SNU Monthly Review, the SNU Team sent Skinner to SNU Level 1 because he was "decompensating," was observed using his "fists and chairs" to beat windows, threatened to "kill someone," and told correctional officers that "the gloves are off." Monthly Review (6/22/16), ECF No. 33 at 41. Skinner has not disputed this account or otherwise presented evidence to refute it. Where there was a clear basis to move Skinner to a more restrictive level at that time, the Court finds that the evidence does not support a First Amendment retaliation claim relating to that move. Thus, Skinner has not asserted a viable First Amendment retaliation claim based on the allegations in the Complaint.

In the Supplemental Complaint, Skinner provides additional allegations that on March 28, 2018, Skinner attended his SNU Monthly Review meeting and complained that he was receiving proper improper mental health treatment, asserted that he was being subjected to harsh and abusive treatment, and told the SNU Team that he would not drop the present civil action filed in November 2017. Since then, he alleges, he has been kept in administrative segregation permanently as a form of retaliation. Where this claim relating to his placement in administrative segregation since March 2018 was not addressed in the Motion, the Motion will be denied on this issue without prejudice.

### E.     SNU Claims

#### 1.     Equal Protection

In his equal protection claim, Skinner asserts that Defendants have violated his right to equal protection of the law by using the SNU level system to punish him. To succeed on an equal protection claim based on his placement in administrative segregation, Skinner must prove that he was treated differently than other similarly situated inmates as a result of intentional discrimination and that his disparate treatment was not rationally related to any legitimate penological interest. *See King v. Rubenstein*, 825 F.3d 206, 220-21 (4th Cir. 2016). Here, Skinner has not even alleged, much less established, that there are similarly situated inmates who were treated more favorably in the SNU level system without a rational basis for doing so. Skinner's equal protection claim is therefore not viable. The Motion will be granted as to this claim.

#### 2.     Americans with Disabilities Act

Skinner asserts that Defendants have violated the ADA by denying him the right to participate in the SNU Program. Title II of the ADA prohibits qualified individuals with disabilities from being excluded from participation in or being denied the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132. A qualified individual with a disability is defined as any person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). A "public entity" is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1).

To establish an ADA claim, Skinner must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he is otherwise qualified; and (3) the exclusion, denial of benefits,

or discrimination was by reason of the disability. *See id.* § 12132; *Constantine*, 411 F.3d at 498. In his verified Complaint and declaration, Skinner asserts that he has a disability consisting of schizo-affective and post-traumatic stress disorder, and that he is being denied participation in the SNU, group therapies, and prison programs by virtue of his placement on administrative segregation and SNU Level 1 or Level 2 status.

Defendants correctly argue they may not be sued in their individual capacities under the ADA. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 471 (4th Cir. 1999). However, they do not address the ADA claims against them in their official capacities. Because Title II of the ADA abrogated the sovereign immunity of states otherwise preserved by the Eleventh Amendment, plaintiffs bringing a claim under Title II may seek damages in addition to injunctive relief. *See United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Constantine*, 411 F.3d at 490 (holding that, at least as it applies to public higher education, Title II abrogates state sovereign immunity). Defendants have submitted copies of Skinner's certificates of successful completion for ten different programs, but Skinner states in his declaration that he is "unable to actually physically participate in these groups and programs because the SNU frequently and for long periods of time assigns [him] to administrative segregation or Level 1 or Level two program status," which "forbid" him from physically attending and participating in these therapy groups. Skinner Decl. at 1, Opp'n Mot Summ. J. Ex. 9, ECF 18-9. He claims that he "received certificates for these programs simply because his name is on the list." *Id.* However, even if Skinner has been denied access to the SNU Program, he has not alleged facts supporting the conclusion that the exclusion was based on his disability within the meaning of Title II. *See Fitzgerald v. Corrs. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (holding that an ADA claim arising from a denial of medical treatment is likely not viable where "the handicapping condition is related to the condition to be

treated" and is "the reason [the plaintiff] was seeking medical treatment"). Notably, the allegations in the Amended Complaint are that Skinner has been denied access to the SNU Program either because he got into a fight with Taylor, or as retaliation for complaints and this lawsuit, not because he has a mental health condition. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to the ADA claims.

To the extent that Skinner seeks to introduce through his Opposition a new claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (2018), he may not do so. *See Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (stating that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" (citation omitted)); *see also Zachair Ltd. v Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint" (citations omitted)), *aff'd* 141 F.3d 1162 (4th. Cir. 1998).

## F.    Phone Calls

Skinner's claim that he was denied access to a phone to talk to his attorney is most fairly construed as a First Amendment claim for denial of access to the courts. Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). This right, however, is limited to protecting an inmate's right "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis v. Casey*, 518 U.S. 343, 355 (1996). Impairment of the ability to litigate any other matter is considered an incidental consequence of conviction and incarceration and is thus constitutional. *Id.*

Thus, to state a claim for a denial of access to the courts, a plaintiff must allege facts showing that his ability to advance such a claim was actually harmed. *Id.* at 351; *see Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (en banc) (requiring a prisoner claiming a denial of the right of access to the courts to make specific allegations and identify actual injury resulting from prison officials' conduct). There must be "actual injury" to "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was frustrated or impeded because of the denial of access to the courts. *Lewis*, 518 U.S. at 352-53 & n.3. The complaint must contain a sufficient description of the predicate claim to permit an assessment of whether it is "nonfrivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). It must also allege facts that specifically articulate how the litigation was harmed. *See, e.g, Johnson v. Hamilton*, 452 F.3d 967, 973-74 (8th Cir. 2006) (dismissing an access-to-courts claim arising from the alleged destruction of the prisoner's legal papers because there was no allegation of facts supporting a finding of injury or prejudice); *Ali v. District of Columbia*, 278 F.3d 1, 8 (D.C. Cir. 2002) (holding that an allegation that the failure to transport a prisoner's legal documents to his prison caused his unspecified "open case" to be "set back" did not state a claim of actual injury from a denial of access to courts); *Cody v. Weber*, 256 F.3d 764, 769-70 (8th Cir. 2001) (holding that lack of access to computer disks containing the prisoner's legal materials did not establish a denial of access to courts because the vague allegation that the stored data would "set him free" was insufficient to establish actual injury).

Under this standard, Skinner's vague allegation that he was not permitted to make legal telephone calls, even on multiple occasions, does not state a First Amendment claim. Skinner has

not identified the legal proceeding to which his phone calls would have related and how that case was harmed by his alleged inability to talk to his attorney. Moreover, the inmate request forms submitted by Skinner show that when he was on segregation or on SNU Level 1, his attorney could contact the case manager to set up a phone call, he could request that case managers make copies of legal documents, and he sent and received letters from his attorney. The Motion will be granted as to the access-to-courts claim relating to legal phone calls.

### G.    ARPs

To the extent that Skinner's complaints about NBCI refusing to process ARPs is construed as an access-to-courts claim, that claim fails. Beyond the fact that Skinner has not alleged facts showing that any of Defendants were responsible for the failure to process any ARPs, Skinner does not identify how any such failure hindered a legal claim relating to his sentence or his conditions of confinement. No legal claim was lost based on a failure to exhaust administrative remedies. Indeed, this Court is presently considering his claims relating to conditions of confinement. Accordingly, the access-to-courts First Amendment claim will be dismissed.

To the extent that Skinner's complaints about ARPs could be construed as due process claims, they also fail. First, Skinner's primary allegation, that Wilson did not initially process his ARP and tried to convince him not to file it, did not interfere with his right to due process because Skinner filed the ARP anyway. Second, to the extent that NBCI officials did not respond to all of his ARPs or did not provide responses satisfactory to Skinner, prisons do not create a liberty interest protected by the Due Process Clause when they adopt administrative mechanisms for hearing and deciding inmate complaints, so the failure to abide by those administrative mechanisms does not create a constitutional claim. *See Ewell v. Murray*, 11 F.3d 482, 487-88 (4th Cir. 1993). Third, the procedural protections of the Due Process Clause apply only to actions that

implicate a protected liberty interest, such as those that result in the loss of good time credits or otherwise extend the time an inmate must serve, or which "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 477-78, 483-84. None of the allegations in the ARPs, whether or not they were processed, support a conclusion that the prison's failure to address them implicated such a liberty interest. The Motion will be granted as to the ARP claims.

## CONCLUSION

For the foregoing reasons, Skinner's Motion to File a Supplemental Complaint, ECF No. 38, will be GRANTED, but the Court will dismiss without prejudice the Jane/John Doe Defendants; Skinner's Motion to Enter Automatic Disclosures, ECF No. 40, will be DENIED; and Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, ECF No. 31, will be GRANTED IN PART and DENIED IN PART. Defendants' Motion will be granted as to the constitutional claims against Defendants in their official capacities; the claims against Secretary Moyer and Warden Bishop; the Eighth, Fourteenth, and First Amendment claims relating to Skinner's assignment to segregation between July 2015 and September 2017; the equal protection claim; the ADA claims; and the claims relating to Skinner's ARPs and legal telephone calls. The Motion will be DENIED WITHOUT PREJUDICE as to the Eighth, Fourteenth, and First Amendment claims relating to Skinner's assignment to segregation after September 2017. A separate Order shall issue.

Date: March 4, 2020

THEODORE D. CHUANG
United States District Judge