# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TRACY L. SKINNER,

       Plaintiff,

       v.

BRUCE LILLER, *Head of Psychology*
*Department and SNU Treatment Team,*
WILLIAM BOHRER,
*Chief of Security,*
LIEUTENANT VAUGHN WHITEMAN,
MICHELLE SAWYERS,
*Program Historian Designee,*
RICHARD RODERICK,
*Case Management Manager,*
JASON MCMAHAN, *Case Manager of the*
*Administrative Segregation Review Board,*
M. SUSAN JOHNSON,
*Administrative Segregation Review Board,*
JORDAN TISCHNELL,
*Administrative Segregation Review Board,*
LIEUTENANT THOMAS SAWYERS and
JOHN G. SINDY,

       Defendants.

Civil Action No. TDC-17-3262

## MEMORANDUM OPINION

Plaintiff Tracy L. Skinner, an inmate at North Branch Correctional Institution in Cumberland, Maryland ("NBCI"), has filed a civil rights action under 42 U.S.C. § 1983 alleging constitutional violations arising from his placement in administrative segregation for approximately two and a half years. Pending before the Court are two separate Motions to Dismiss or, in the Alternative, Motions for Summary Judgment, one filed by Defendant Bruce Liller, ECF No. 56, and the other filed by Defendants William Bohrer, Lt. Vaughn Whiteman, Michelle

Sawyers, Richard Roderick, Jason McMahan, M. Susan Johnson, Jordan Tischnell, Lt. Thomas Sawyers, and John G. Sindy (collectively, the "Correctional Defendants"), ECF No. 76. Also pending are Skinner's Motion for Appointment of Counsel, ECF No. 63; Skinner's Motion for Leave to File an Amended Complaint, ECF No. 75; and the Correctional Defendants' Motion to Seal Psychological Records, ECF No. 78.

Having considered the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motions to Dismiss or, in the Alternative, Motions for Summary Judgment will be GRANTED IN PART and DENIED IN PART, and the remaining Motions will be GRANTED.

## BACKGROUND

Background facts and procedural history were set forth in detail in the Court's prior memorandum opinion on Defendants' first Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("the First Motion"), which the Court incorporates by reference here. *See Skinner v. Moyer*, No. TDC-17-3262, 2020 WL 1065740 (D. Md. Mar. 4, 2020) (*"Skinner I"*). Additional facts and procedural history relevant to the resolution of the pending Motions are set forth below.

### I.   Procedural History

Skinner's original Complaint named as Defendants Stephen T. Moyer, Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"); Frank B. Bishop, the Warden of NBCI; and Bruce Liller, the head of the Psychology Department and Special Needs Unit ("SNU") at NBCI. Skinner alleged constitutional violations arising from his placement in administrative segregation on multiple occasions from 2015 to 2017, his placement in the various levels of the SNU Program, which provides services to inmates with mental health issues, and

other related issues.  He also alleged that Defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12165 (2018), by denying him access to the SNU Program.  On March 4, 2020, the Court granted in part and denied in part the First Motion.  The Court dismissed, or granted summary judgment, on all claims in the original Complaint, including the constitutional claims relating to Skinner's placements in administrative segregation between July 2015 and September 2017.  While that motion was pending, however, on August 7, 2019, Skinner filed a Supplemental Complaint, naming the Correctional Defendants as additional Defendants and alleging that after he served 180 days in disciplinary segregation beginning in September 2017 as punishment for attacking another inmate, he was then placed directly into administrative segregation and, as a result, had remained in segregation continuously and indefinitely for two years, from September 2017 to August 2019, and was thus denied access to the SNU Program.  In the Supplemental Complaint, which the Court accepted, Skinner asserted that this continuing detention violated his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution, his right to due process under the Fourteenth Amendment, and his First Amendment right to be free from retaliation, based on his assertion that the continuing administrative segregation was imposed in retaliation for his refusal to dismiss the present lawsuit.  He also alleged violations of the Maryland Declaration of Rights and the ADA. Because the Court found that these supplemental claims could not be dismissed on their face, the Court denied the First Motion as to these claims.  Since neither Liller nor the Correctional Defendants had had an opportunity to respond directly to the new claims, the Court permitted those parties to file the pending Motions.  On May 26, 2020, Skinner filed a Second Supplemental Complaint, which the Court has accepted, adding Sindy as a Defendant and additional allegations that Lt. Sawyers antagonized and provoked him at monthly SNU progress review meetings, that

3

Defendant Johnson denied his requests to receive Administrative Procedure Remedy complaint ("ARP") forms, that Defendant McMahan improperly calculated his security classification, and that Defendants violated a specific prison policy. All Defendants have had an opportunity to address the allegations in the Second Supplemental Complaint in their Motions.

## II.    Factual Background

Skinner is serving a 30-year sentence imposed in 2003 for second-degree murder. *State v. Skinner*, No. 20-K-03-7732 (Cir. Ct. Talbot Cty. Nov. 11, 2003). On June 1, 2013, while housed at Patuxent Institution, he assaulted a correctional officer. Skinner was charged with second-degree assault and was transferred to NBCI. On December 10, 2014, Skinner was found not criminally responsible on the assault charge. *State v. Skinner*, No. 13-K-I4-54433 (Cir. Ct. Howard Cty. Dec. 10, 2014). The Circuit Court for Howard County determined that Skinner did not require confinement to a psychiatric hospital and instead would remain at NBCI or another prison operated by the DPSCS to complete his criminal sentence and would be transferred to a psychiatric hospital after the completion of that sentence. Skinner was required to receive mental health treatment while in prison. *State v. Skinner*, No. 13-K-I4-54433 (Cir. Ct. Howard Cty. May 28, 2015). Skinner, who has been diagnosed with schizoaffective disorder and post-traumatic stress disorder, was admitted into the SNU Program at NBCI on October 15, 2014. The SNU Program provides a continuum of care for inmates with serious mental illness who need more structure and mental health services in the least restrictive environment consistent with institutional safety and security. An SNU Treatment Team ("SNU Team") monitors an inmate's progress in the SNU Program.

### A.    Disciplinary and Administrative Segregation

From July 2015 to September 2017, when not placed in administrative segregation for temporary periods of time, Skinner was assigned to an SNU housing tier. On September 27, 2017,

4

Skinner seriously injured another SNU inmate, Tyrese Keene-Taylor, during a fight. In October 2017, Skinner pleaded guilty to an infraction for the assault and was sanctioned with 180 days of disciplinary segregation, which caused him to be placed in Housing Unit 1, which contains segregation housing. On November 3, 2017, Skinner filed the original Complaint in this case. On January 9, 2018, while on disciplinary segregation, Skinner threw a food tray at an officer, was issued an infraction, and received an additional 120 days of disciplinary segregation.

According to Skinner, on March 28, 2018, at a meeting to discuss whether Skinner would be returned to SNU housing after the completion of his disciplinary segregation, Skinner told a case manager that he was not receiving adequate mental health treatment. He also stated that regardless of whether he would be returned to SNU housing, he would not drop the pending lawsuit. Skinner was then removed from the meeting.

On April 27, 2018, Skinner was designated to be placed on administrative segregation as of May 8, 2018, the date that his disciplinary segregation was scheduled to end, in order to keep him separated from his documented enemy, Keene-Taylor, who was residing in the general population in Housing Unit 2. According to Benjamin Bradley, a Correctional Case Manager II at NBCI, administrative segregation is an institutional assignment and housing designation that separates an inmate from the general prison population to maintain the safety and security of the facility, including to ensure that documented enemies are not housed simultaneously in the general population.

Skinner, however, asserts that while on administrative segregation, he was subjected to "extreme isolation" and "sensory deprivation," because he received only one hour of recreation, five days a week, which consisted of solitary exercise in a cage at 11:00 p.m. without access to sports equipment; received only three 15-minute showers per week; was patted down and

restrained whenever he was allowed to exit his cell; and remained in his cell 24 hours per day on days without recreation or a shower. Supp. Compl. at 4-5, ECF No. 46. He had no access to a dayroom or common room; to religious services; to social work, mental health, or peer group programs; or to work opportunities. He received no contact visits and had severely limited phone access at unreasonable times, such as at 12:30 a.m. He was ineligible for good conduct or special project credits. According to Skinner, administrative segregation also had an adverse impact on his security classification because during an annual review of his security classification on June 6, 2018, Defendant McMahan reported that Skinner was in administrative segregation, was thus not in any prison programs, and therefore received no points for participation in such programs that could be applied to reduce his security classification.

The Correctional Defendants offer no evidence on the specific conditions faced by Skinner. In describing the general policy on administrative segregation, Bradley acknowledged that inmates in that status are only allowed recreation five days a week, in a cage; have no access to religious services; must take all meals in their cells; and are handcuffed whenever they leave their cells. He noted, however, that such inmates may maintain the same personal property as general population inmates, such as televisions, gaming consoles, and CD players; that inmates on administrative segregation may make phone calls every other day; and that showers are permitted daily.

As a result of his prolonged administrative segregation, Skinner states that he suffered adverse mental health consequences, including significant anxiety, "hyper response to external stimuli," increased perceptual distortions, insomnia, and self-destructive outbursts. Supp. Compl. at 5. Specifically, while in administrative segregation, he broke his left hand on November 8, 2019 when he punched a wall, and on November 11, 2019, Skinner repeatedly hit himself in the face, causing wounds to his cheek and eye area, and stated that he wanted to die. On January 19, 2020,

6

he broke his right hand in another self-destructive episode. Later, in July 2020, Skinner again hit himself hard enough to give himself a black eye.

As of the filing of the Supplemental Complaint in March 2020, Skinner had been on administrative segregation since May 8, 2018, or for 22 months. On October 21, 2020, he was finally removed from administrative segregation and transferred to Housing Unit 2, after Keene-Taylor was transferred to another facility on October 16, 2020. At that point, Skinner had endured approximately 29 months, or two years and five months, of administrative segregation. Presently, Skinner lives in Housing Unit 2 and is included in the SNU Program.

### B.    Periodic Reviews

During his 29-month period of administrative segregation, Skinner was the subject of two different forms of monitoring. First, there were monthly meetings at which an Administrative Segregation Review Board reviewed his status, including by interviewing Skinner. Among the members of the Administrative Segregation Review Board were Defendants Liller, Whiteman, Roderick, Michelle Sawyers, McMahan, Johnson, and Sindy, all of whom attended the June 19, 2018 meeting. According to Skinner, at these sessions, the Administrative Segregation Review Board informed him that based on the guidance of Skinner's SNU Team, he was not to be released from administrative segregation because he was on Keene-Taylor's enemy list. Some of the meetings were held without Skinner for unknown reasons. In other cases, Skinner refused to participate because after he had been consistently told that no changes to his status were being made, he considered the meetings to be "sham" hearings. Opp'n Liller Mot. Dismiss at 8, ECF No. 64. Beginning in April 2020, because of the COVID-19 pandemic, all in-person inmate reviews, including Administrative Segregation Review Board meetings, were stopped unless

determined "absolutely necessary," so the monthly reviews were conducted electronically. Johnson Decl. ¶ 7, Corr. Defs.' Mot. Summ. J. Ex. 5, ECF No. 76-8.

Second, there were monthly SNU Team meetings to monitor Skinner's mental health status. Skinner has stated that he was no longer a part of the SNU Program while he was on administrative segregation and was not receiving adequate mental health treatment. According to Bradley, however, an inmate's SNU Team may elect to allow an inmate to remain in the SNU Program while assigned to administrative segregation and thus to continue to be reviewed by the SNU Team monthly. According to Sindy, who at the relevant time was a Correctional Case Management Specialist II at NBCI, Skinner remained assigned to the SNU Program while on disciplinary and administrative segregation. At various times after September 2017, Skinner's SNU Team included Liller, Lt. Sawyers, Sindy, and Michelle Sawyers.

According to Bradley, the SNU Team is neither responsible for nor has authority to determine whether an inmate is placed on, or removed from, administrative or disciplinary segregation. Nevertheless, Skinner's SNU Team continued to meet monthly to discuss Skinner. From May 8, 2018 forward, the SNU Team progress review meetings were conducted in Skinner's absence. Notes from the meetings reflect no discussion of substance other than the fact that Skinner would remain in administrative segregation because of his "enemy situation." DPSCS Confidential Notes (Skinner) at 9, Corr. Defs. Mot. Summ. J. Ex. 6, ECF No. 76-9. On June 26, 2019, the SNU Team noted that Skinner had "[a]ssaulted himself today." *Id.* at 5. After April 2020, during the COVID-19 pandemic, the SNU Team progress review meetings were held electronically.

8

## DISCUSSION

### I.     Preliminary Motions

At the outset, the Court will grant Skinner's Motion for Leave to File an Amended Complaint, ECF No. 75, because he seeks only to dismiss the claims against Defendant Whiteman. As requested, the Court will dismiss the claims against Whiteman.  The Court will also grant the Correctional Defendants' Motion to Seal Skinner's psychological records, ECF No. 78.

### II.     Motions to Dismiss or, in the Alternative, Motion for Summary Judgment

Construed liberally, the operative Complaint against the Correctional Defendants asserts all of the claims set forth in the original Complaint, ECF No. 1; the Supplemental Complaint, ECF No. 46; and the Second Supplemental Complaint, ECF No. 49.  The Court has already granted a dispositive Motion as to all claims against Liller in the original Complaint except for those relating to Skinner's prolonged administrative segregation from September 2017 forward.  *See Skinner I,* 2020 WL 1065740, at *11, *14.  Where none of Skinner's pleadings assert facts connecting the Correctional Defendants to the dismissed claims or provide a basis to revisit the Court's prior analysis, the Court finds that for the same reasons stated in the its memorandum opinion on the First Motion, all claims asserted in the original Complaint, except for those relating to Skinner's administrative segregation from September 2017 forward, are dismissed as to the Correctional Defendants.   These claims include constitutional claims relating to Skinner's placement in disciplinary or administrative segregation before September 2017; constitutional and statutory claims relating his placement within the SNU Program and his mental health treatment prior to that date, including claims under the ADA; and claims relating to access to phone calls with his attorney and the ARP process.  The remaining claims thus consist of (1) the claims that Skinner's prolonged administrative segregation after September 2017 violated the Eighth, Fourteenth, and

First Amendments; (2) the claim that during that time period, he was denied adequate mental health care, in violation of the Eighth Amendment; (3) the claims in the Supplemental Complaints that McMahan caused Skinner's security classification to be higher than necessary, that Lt. Sawyers antagonized Skinner at SNU progress review meetings, that Johnson denied his request for ARP forms, and that unspecified Defendants violated a prison policy, Division of Correction Directive 50-2 ("DCD-50-2"); and (4) the claims under Article 25 of the Maryland Declaration of Rights, presumably state constitutional claims parallel to his federal constitutional claims.

### A.      Legal Standards

Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56.   To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678.   The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).   Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d).   Before converting a motion to dismiss to one

for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted).

Here, the notice requirement has been satisfied by the title of Defendants' Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or an equivalent filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 245 (4th Cir. 2002). Skinner has not filed an affidavit seeking discovery and has submitted certain exhibits with his memoranda in opposition to the Motions. Under these circumstances, on those arguments for which the Court must consider submitted exhibits, the Court will construe the Motions as Motions for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome

of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B.    Prolonged Administrative Segregation

In ruling on the First Motion, the Court considered Skinner's claims under the Eighth, Fourteenth, and First Amendments relating to his prolonged administrative segregation from September 2017 forward. Skinner had alleged that, as of the time of the Court's ruling, he had served a period of approximately eight months of disciplinary segregation that was then followed by almost two years of administrative segregation without any definable end point, and he described conditions that were comparable to those deemed to violate the Eighth Amendment in *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), in which inmates, on a long-term basis, were confined in their cells for 23 or 24 hours a day, with a night light on all night; were allowed only one hour of outdoor recreation, five days a week, in a cage; were limited to three ten-minute showers per week; and were not permitted leave their cells for meals or to participate in religious or prison programming. *Id.* at 353-54. The Court thus denied the First Motion as to the Eighth Amendment conditions of confinement claim. *Skinner I*, 2020 WL 1065740, at *11. The Court also denied the First Motion as to the due process claim because when the alleged conditions of confinement were combined with the prolonged duration, they arguably imposed an "atypical and significant hardship" that could implicate a liberty interest and Skinner's due process rights. *Id.* at *10-11 (citing *Sandin v. Conner*, 515 U.S. 472, 486 (1995), and *Wilkinson v. Austin*, 545 U.S. 209, 214, 223-24 (2005)). Finally, where Skinner had alleged that his prolonged administrative segregation followed his filing of the present lawsuit and his assertion that he would not dismiss

12

this case even if he were returned to the general population, the Court denied the First Motion as to the claim of retaliation under the First Amendment. *Skinner I*, 2020 WL 1065740, at \*12.

Because neither Liller nor the Correctional Defendants had formally responded to these allegations, the Court's rulings on these claims were entered without prejudice, with the expectation that Defendants would file motions seeking dismissal or summary judgment and provide arguments or evidence to refute Skinner's allegations or to establish that their actions were entirely lawful. Although Defendants have filed now filed their Motions, they have not shown that the claims relating to prolonged administrative segregation must fail.

### 1. Eighth Amendment

The Eighth Amendment protects inmates from inhumane treatment and conditions. *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). To establish an Eighth Amendment claim based on conditions of confinement, a prisoner must show that: (1) objectively, "the deprivation suffered or injury inflicted on the inmate was sufficiently serious"; and (2) subjectively, "the prison official acted with a sufficiently culpable state of mind." *Id.* at 238 (citation omitted). The objective prong requires that the prisoner sustains a "serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of serious harm resulting from . . . exposure to the challenged conditions." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)). When assessing whether conditions of solitary or segregated confinement violate the Eighth Amendment, courts must consider "what the Supreme Court has termed the evolving standards of decency that mark the progress of a maturing society." *Sweet v. S.C. Dep't of Corr.*, 529 F.2d 854, 860 (4th Cir. 1975) (en banc) (citation omitted). Recently, the United States Court of Appeals for the Fourth Circuit has stated that "prolonged solitary confinement exacts a heavy psychological toll that often continues to plague

an inmate's mind even after he is resocialized." *Porter*, 923 F.3d at 357 (quoting *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015)).   Courts must consider "the totality of the circumstances," including "the time covered by the punishment or deprivation." *Mitchell v. Rice*, 952 F.2d 187, 191 (4th Cir. 1992); *see also Rivera v. Mathena*, 795 F. App'x 169, 174 (4th Cir. 2019) (considering "the duration of harm" as an important factor in the Eighth Amendment analysis).

Rather than refuting Skinner's allegations, Defendants have largely confirmed his version of the facts relating to his administrative segregation.   They acknowledge that following his disciplinary segregation, Skinner was placed into administrative segregation indefinitely, from May 2018 forward, and that even after the Court's ruling on the First Motion in March 2020, they left him in administrative segregation for another seven months, until he was finally released in October 2020.   They also largely confirm, or fail to refute, Skinner's account of his conditions of confinement:   they do not contest that he was isolated in his own cell for 23 hours per day, with no meals outside his cell and only one hour of recreation five days a week in a cage, at night, without sports equipment; that he was handcuffed whenever he was allowed to leave his cell; and that he had no access to communal activities, religious services, any prison programs, or contact visits.   They identify certain factual disputes about his conditions of confinement, including that they state that the general policy for administrative segregation allows for daily showers, while Skinner alleges that he received only three showers per week; and that the policy allows for phone calls every other day, while Skinner asserts that he was only permitted to make calls in the middle of the night.   Particularly when the facts must be viewed in the light most favorable to the nonmoving party, the conditions of confinement, based on the present record, continue to appear comparable to those in *Porter*. Although certain conditions in *Porter*, such as the presence of a

14

night light and the size of the cell may have been more draconian than those faced by Skinner, others, such as the restrictions on recreation and phone calls to late night hours may have been more restrictive. *See Porter*, 923 F.3d at 354, 357. While Defendants note that Skinner retained certain benefits, such as the ability to have a television in his cell and regular mental health consultations, those conditions were also present in *Porter*, in which inmates received weekly visits from a mental health practitioner. *See id.* at 354.

Moreover, the record now establishes that Skinner was subjected to these conditions for a total of over three years, the last 29 months of which were not based on any formal discipline for misconduct, and he has alleged not only that he had serious mental health issues before his administrative segregation and suffered mental health deterioration as a result, but he has also asserted in the verified Second Supplemental Complaint, and medical records confirm, that he suffered physical injuries in that he engaged in self-destructive behavior on three occasions from November 2019 to July 2020, including breaking both his left hand and right hand, in acts likely traceable to the trauma of the administrative segregation. *See In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471-72 (4th Cir. 1999) (finding that indefinite segregation of over three years did not violate the Eighth Amendment in part because the only harm alleged by the plaintiffs was depression and anxiety, not "serious or significant physical or emotional injury"). Defendants have therefore not provided a basis to alter the Court's initial conclusion that Skinner, at least based on the present record, continues to have viable claim that his conditions of confinement could violate the Eighth Amendment. *See Skinner I*, 2020 WL 1065740, at *9-10.

15

### 2.  Fourteenth Amendment

For similar reasons, based on the present record, the Court will not conclude that Skinner's conditions of confinement do not meet the standard of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" that is necessary to establish a liberty interest in avoiding such conditions under the Fourteenth Amendment's Due Process Clause  *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).  As the Court noted in resolving the First Motion, assignment to administrative segregation does not alone create an atypical and significant hardship, *see Hewitt v. Helms*, 459 U.S. 460, 468 (1983), and a limited period of segregation, such as a 30-day period, would not implicate due process rights, *see Sandin*, 515 U.S. at 476, 486.  In *Wilkinson v. Austin*, 545 U.S. 209 (2005), however, the United States Supreme Court found that conditions in a super-maximum security prison, where inmates were confined to their cells for 23 hours per day, exercise was limited to one hour a day in a small indoor room, a light remained on in cells at all times, and contact with others was extremely limited, implicated a liberty interest based on the duration of the confinement to the prison, which was reviewed only once per year, and the fact that placement there disqualified an inmate for parole consideration. *Id.* at 214, 223-24.  Based on *Wilkinson*, the Fourth Circuit has identified three factors to be considered in determining whether a liberty interest exists:  (1) the magnitude of the confinement restrictions; (2) whether the administrative segregation was for an indefinite period; and (3) whether the assignment had any collateral consequences on the inmate's sentence. *Incumaa v. Stirling*, 791 F.3d 517, 530 (4th Cir. 2015).  Here, as described above, Skinner's conditions of administrative segregation were in the range of those at issue in *Wilkinson* and *Incumaa. See id.* at 521 (describing conditions of 24-hour confinement except for recreation ten times per month and showers three times a week, eating all meals in the inmate's cell, denial of educational and vocational opportunities, regular strip

searches, and denial of mental health treatment). Though Skinner's duration of administrative segregation ended after two and a half years, it appeared to have been indefinite in nature, with no formal end date, as it was apparently predicated on the vagaries of the residential status of Skinner's documented enemy, Keene-Taylor. As Skinner has noted, his placement in administrative segregation disqualified him from receiving good conduct credits, so there were, as in *Wilkinson*, collateral consequences for his overall length of incarceration. *Wilkinson*, 545 U.S. at 215, 224; *see also Incumaa*, 791 F.3d at 530.

Moreover, where there may have been a due process right associated with Skinner's prolonged administrative segregation, the present record is insufficient to show whether he received due process, which requires "a meaningful opportunity to understand and contest the reasons for holding him in solitary confinement." *Incumaa*, 791 F.3d at 532. Although Skinner's status appears to have been reviewed at Administrative Segregation Review Board monthly meetings as well as at an annual evaluation, case notes of those meetings show that Skinner was not always present, sometimes because he was not included and sometimes because he refused to participate, and in most instances they describe no discussions or deliberations other than that Skinner would be returned to segregation because he had a documented enemy. It is therefore unclear whether these sessions were meaningful reviews that could have resulted in any change of conditions. Although Defendants have provided contemporaneous case notes reflecting that both the Administrative Segregation Review Board and the SNU Team continued to identify the presence of an enemy as the reason for the prolonged administrative segregation, they have not provided a basis to conclude that this explanation alone satisfies due process. Defendants have provided documentation of the prison policy relating to separation from enemies, but it does not state that an offending inmate must be placed in administrative segregation in order to establish

separation, and it certainly does not state that such segregation may last up to two and a half years. There is little to no evidence, including the SNU Team's monthly review reports, to show that prison officials seriously pursued other alternatives, such as transferring Skinner or the enemy to another facility. On this record, the Court will deny the Motions on the Fourteenth Amendment claims relating to prolonged administrative segregation.

### 3.    First Amendment

As for the First Amendment retaliation claim, "[t]he First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000). An inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrs.,* 855 F.3d 533, 545 (4th Cir. 2017). In order to establish a retaliation claim for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendants' conduct. *Martin v. Duffy,* 858 F.3d 239, 249 (4th Cir. 2017) (alterations omitted); *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 499 (4th Cir. 2005). Skinner has alleged First Amendment protected activity in his assertion that he would continue to pursue his lawsuit, and the subsequent 29 months of administrative segregation is fairly construed as adversely affecting his rights. Although the evidence presented by Defendants is consistent with the explanation that the prolonged administrative segregation was motivated by the presence of an enemy, particularly where administrative segregation of this length is not explicitly authorized by the prison policy on enemies and extended for 29 months without any apparent, serious effort to identify an alternative

18

solution, the Court finds that on the present record there remains a genuine issue of material fact on the issue of retaliation and will deny the Motions as to this claim.

Although Defendants invoke the doctrine of qualified immunity, without any case-specific analysis, the Court finds that, under *Porter, Wilkinson, Incumaa,* and *Booker*, the constitutional rights at issue were clearly established at the outset of, or during the continuation of, the alleged violations. *See supra* parts II.B.1-3.

Finally, while Defendants argue that there are insufficient allegations as to particular Defendants, the record evidence, including some of Defendants' own declarations, establishes that Defendants Liller, Roderick, McMahan, Johnson, Michelle Sawyers, and Sindy were, at various points, members of the Administrative Segregation Review Board, and that Defendants Liller, Lt. Sawyers, Michelle Sawyers, and Sindy were members of the SNU Team. Skinner has alleged that Defendant Tischnell was a member of the Administrative Segregation Review Board. As both groups apparently had a role in maintaining Skinner's placement in administrative segregation, the claims against these Defendants will remain. As there is no claim that Defendant Bohrer was a member of either team, and there are no other allegations in the Complaint relating to him, the claims against Bohrer will be dismissed without prejudice.

## C.      Inadequate Mental Health Care

Construed liberally, Skinner has also asserted a claim of deliberate indifference to his serious mental health needs based on inadequate mental health care during his period of administrative segregation. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that

is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson,* 775 F.3d at 178 (quoting *Iko,* 535 F.3d at 241); *see also Scinto* 841 F.3d at 228. "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson,* 775 F.3d at 178 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). There is "no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart." *Bowring v. Godwin,* 551 F.2d 44, 47 (4th Cir. 1977); *see also DePaola v. Clarke,* 884 F.3d 481, 486 (4th Cir. 2018) ("Courts treat an inmate's mental health claims just as seriously as any physical health claims.").

There is no dispute that Skinner had serious mental health needs, as reflected by his inclusion in the SNU Program. Defendants assert that Skinner received adequate mental health care because even while on administrative segregation, he remained a part of the SNU Program, the SNU Team continued to meet monthly to discuss his progress, and he received regular visits from mental health care providers throughout the 29-month period. Although these facts support Defendants' position, the Court finds that summary judgment on this issue is not warranted at this time. First, although the submitted records appear to show that, contrary to his assertion, Skinner remained nominally a part of the SNU Team, Skinner asserts, and Defendants do not seriously dispute, that he was unable actually to participate in the SNU Program. Indeed, McMahan documented that Skinner participated in no prison programs while he was in administrative segregation. Skinner has submitted documentation that he was not able to participate in any therapeutic programming while on administrative segregation, including Conditional Release

Reporting Forms submitted by his therapist. Second, during administrative segregation, the SNU Team meetings generally occurred outside the presence of Skinner, and the case notes relating to Skinner's SNU Team meetings reflect virtually no discussion other than that he would remain in administrative segregation because of his documented enemy. Third, the record includes evidence consistent with the conclusion that mental health providers were aware that Skinner's mental health needs were not being successfully addressed. Specifically, the mental health records reflect that during the administrative segregation, Skinner engaged in self-destructive behavior on at least four occasions between November 2019 and July 2020, including breaking two of his hands, without any notable change in treatment. In particular, written progress notes reflect that mental health providers expressed the view on several occasions in 2019 that Skinner "should not be" on long-term administrative segregation, in part because such segregation is "contraindicated" for an inmate with such mental health issues, and that he "does not have access to the programming he should have," including "therapeutic programming." Opp'n Liller Mot. Summ. J. Ex. 5 at 29-30, ECF No. 64-1. A Conditional Release Reporting Form from February 2019 states that Skinner "does not have access to the programming he should have" and that an inmate such as him "should not be in long term segregation." Opp'n Corr. Defs. Mot. Summ. J. Ex. 3 at 6, ECF No. 81-3. Finally, the psychiatric and therapy records submitted appear to be incomplete, in that no records were submitted for a nearly one-year period, from September 2018 to July 2019.

In light of these issues, and where the treatment records have been interpreted only by Defendants, without any review by a mental health professional acting on behalf of Skinner, the Court finds that there remain genuine issues of material fact, and discovery is necessary to ensure that all relevant evidence is available, before this claim can be resolved.

Although the Correctional Defendants are not mental health providers, a significant part of the claim of inadequate mental health care appears to be based on the decision to place Skinner on administrative segregation for two and a half years, despite the fact that Skinner had serious, ongoing mental health needs and would not be able to participate meaningfully in the SNU Program.  According to Defendants, that specific decision was made by the Administrative Segregation Review Team, not the SNU Team.  Where the Correctional Defendants participated in the decisions to extend Skinner's administrative segregation and the record is incomplete on the degree to which they were aware of the mental health impact of such administrative segregation, the Court will not dismiss the claims against them at this time.

**D.      Remaining Claims**

To the extent that Skinner's allegations against McMahan, Lt. Sawyers, and Johnson in his two Supplemental Complaints were intended to assert causes of action other those discussed above, they do not state plausible claims for relief.   In the Supplemental Complaint, Skinner alleges that McMahan, who completed a formula-based inmate security level review of Skinner on June 6, 2018, improperly graded him as "unsatisfactory," and thus granted him zero points, on the category of "Job and Program Participation," because Skinner had no institutional job assignment and was not participating in any programs or in the activities of the SNU Program while he was on administrative segregation. Supp. Compl. at 2; Supp. Compl. Ex. 1, ECF No. 46-1. Even if this allegation is true, and if the points assigned arguably could affect Skinner's housing placement, an inmate generally does not have a constitutional right to a specific security or other classification relevant to housing placement. *See, e.g.*, *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). Accordingly, there is no freestanding constitutional claim arising from the calculation of Skinner's

security classification. These allegations, however, remain relevant to Skinner's broader claim that his prolonged administrative segregation was unconstitutional.

As to Lt. Sawyers, Skinner alleges that Sawyers antagonized and provoked him at monthly SNU progress review meetings, which caused him to act out at most of his monthly SNU reviews. Lt. Sawyers has provided a declaration denying Skinner's allegation. Even if Skinner's allegation is true, "not all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Mere verbal abuse and taunting of inmates by guards, including aggravating language, does not state a constitutional claim. *See McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001); *Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002); *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983). Thus, although Skinner's allegation about Lt. Sawyers, if true, may be relevant to his broader claims about improper prolonged administrative segregation, they do not support a freestanding cause of action.

As for Johnson, Skinner alleges that when he asked her for various ARP forms, she responded, on March 30, 2020, by stating, "Unfortunately, the supply of ARP's is low right now." 2d Supp. Compl. Ex. 1, ECF No. 49-1. Notably, Skinner had been able to file three ARPs in February 2020 relating to his hand injury and his need for medication. Pursuant to the Court's analysis in resolving the First Motion, these facts do not support a constitutional claim because there is no allegation that Johnson's actions cost Skinner the ability to succeed on a specific legal claim, and because Skinner does not have a liberty interest in the ARP process established by NBCI. *See Skinner I*, 2020 WL 1065740, at *14; *Booker*, 855 F.3d at 541 ("[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure"). For the same reason, Skinner's general claim that the Correctional Defendants violated DCD-50-2 also

fails to state a valid constitutional claim. *See Myers v. Klevenhagen,* 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d, 613, 629 n.6 (D. Md. 2015) (citing *Myers*).

### E.      Maryland Constitution

Article 25 of the Maryland Declaration of Rights provides that "excessive bail ought not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted, by the Courts of Law." Md. Const. Decl. of Rights art. 25. Article 25 is "substantially identical to the Eighth Amendment" and is thus construed *in pari materia* with the Eighth Amendment. *Aravanis v. Somerset Cty.*, 664 A.2d 888, 893-94 (Md. 1995); *see Evans v. State*, 914 A.2d 25, 67 (Md. 2006) (stating that Article 25 has been "consistently construed" as "*in pari materia*" with its federal counterpart). Where, as discussed above, the Court will deny the Motions as to the Eighth Amendment claims, and Defendants have offered no separate argument relating to the Article 25 claim, the Court will deny the Motions as to the state constitutional claims as well.

### CONCLUSION

For the foregoing reasons, the Correctional Defendants' Motion to Seal and Skinner's Motion for Leave to File an Amended Complaint will be GRANTED, and Defendant Whiteman will be dismissed from this case. The Motions to Dismiss or, in the Alternative, Motion for Summary Judgment, will be GRANTED IN PART and DENIED IN PART. The Motions will be granted as to (1) all claims against Defendant Bohrer, which will be dismissed without prejudice; and (2) all claims against the other Defendants, with the exception of the following claims on which the Motions will be denied: the Eighth, Fourteenth, and First Amendment claims relating to prolonged administrative segregation after September 2017; the Eighth Amendment claims relating to allegedly inadequate mental health treatment after September 2017; and the parallel state constitutional claims under Article 25 of the Maryland Declaration of Rights. Because

discovery is necessary to complete the factual record in this case, and Skinner cannot reasonably conduct such discovery on his own, the Motion for Appointment of Counsel will be GRANTED. A separate Order shall issue.

Date:   March 19, 2021

THEODORE D. CHUANG
United States District Judge